IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 04-30057-AA |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| STEPHEN WAYNE MURPHY, | |
| Defendant. | |

_____

AIKEN, Judge:

Defendant is charged with the manufacture of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c). Defendant moves to suppress all evidence and statements obtained as a result of a warrantless search of a storage unit on August 4, 2004. Defendant claims that the search violated his rights under the Fourth Amendment to the United States Constitution. The government maintains that defendant has no standing to contest the search of the storage unit and that valid consent was given for the search.

1  - OPINION AND ORDER

On August 8 and September 6, 2005, the court heard oral argument and testimony from several witnesses. Upon review of the briefing, testimony, and argument, the motion is denied.

FACTS

On August 4, 2004, Jackson County Narcotics Enforcement Team (JACNET) detectives were investigating two individuals, identified as "Cozo" and "Wyman," who were observed purchasing ingredients commonly used to manufacture methamphetamine. At approximately 3:30 p.m., JACNET detectives followed these individuals to a storage unit located at 2688 Crater Lake Highway. At the time, JACNET Sergeant Matt Thompson had been informed that defendant had been using storage units rented by Dennis Roper at that location. Thompson testified that defendant was well known to him as a manufacturer of methamphetamine based on numerous past contacts.

After a short period of time, Wyman left the storage unit in a vehicle. After contacting Wyman, JACNET Lieutenant Patton informed Thompson that Wyman no longer possessed methamphetamine ingredients.

At approximately 4:15 p.m., JACNET Detective Ivens saw Cozo leave storage unit #17. Thompson contacted Cozo approximately six feet from the roll-up door of #17, which was almost completely closed. Through two holes in the door, Thompson observed a person closing the door. Thompson knocked on the door, and defendant immediately opened the door by pulling it up. Thompson recognized

defendant and observed him holding a ten-inch piece of metal pipe. Thompson instructed defendant to drop the item, but defendant refused. Thompson stepped to the right and again told defendant to drop the object, and defendant complied. The parties dispute whether Thompson entered the storage unit after defendant opened the door. Regardless, Thompson observed an operating methamphetamine lab in plain view inside the storage unit. Thompson then arrested defendant and read him Miranda rights.

After his arrest, Thompson and Ivens performed a protective sweep of unit #17 and adjoining unit #18. Defendant refused to give consent to search the storage unit. Defendant was lodged in jail on a probation violation for failure to report.

At 6:45 p.m., JACNET Lieutenant Dewey Patten and Detective Darin May contacted Roper, who rented storage units 17 and 18 and had outstanding warrants for his arrest. Patten told Roper that detectives located a methamphetamine lab in storage unit #17. Roper indicated that he had no knowledge of the lab, but that he knew defendant and let him stay in one of the storage units. Patten arrested Roper on the outstanding warrants and read Roper his Miranda rights.

Roper gave signed consent to search the storage units. Officers search the units and seized a functioning methamphetamine lab in #17. Officers also observed the used medical equipment that Roper had described.

3   - OPINION AND ORDER

Defendant later admitted to manufacturing methamphetamine and described his manufacturing process to Thompson.

## DISCUSSION

Defendant argues that the evidence seized during the search of unit #17 and all statements obtained after the search must be suppressed, because Thompson entered the unit without a warrant or exigent circumstances, and the officers did not obtain defendant's consent to search unit #17. Defendant also argues that Roper's subsequent consent to search was not valid, and even if valid, cannot trump defendant's Fourth Amendment privacy rights.

### 1. Standing to Contest the Search

The government maintains that defendant has no standing to contest the search, because he had no reasonable expectation of privacy in unit #17.

A defendant may challenge a search only if the defendant possesses a legitimate expectation of privacy in the premises or item searched. Rakas v. Illinois, 439 U.S. 128, 134, 143 (1978); United States v. Johns, 851 F.2d 1131, 1135-36 (9th Cir. 1988). "To demonstrate this, the defendants must manifest a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." United States v. Sarkisian, 197 F.3d 966, 986 (9th Cir. 1999).

In United States v. Davis, 932 F.2d 752 (9th Cir. 1991), the

court held that the defendant had standing to contest the search of a friend's apartment when the defendant previously lived at the apartment and still possessed a key; had permission to come and go as he pleased; had independent access to the place searched; stored items in a locked safe at the apartment to ensure privacy; and assumed an ongoing obligation to pay rent. 932 F.2d at 757.

In contrast, in Sarkisian, the court held that "a defendant who merely possesses the authority to access a storage rental room but does not use it, without more, lacks Fourth Amendment standing to challenge the unlawful search of that area." 197 F.3d at 987. The court underscored the "recognition that the defendants' expectation of privacy in a commercial storage area is lower than that in a residential area." Id. at 186 (citing Minnesota v. Carter, 525 U.S. 83, 119 (1998)). Although the defendants in that case were listed on the rental agreement as persons who possessed the right to access the locked storage room, they never claimed an interest in items stored or presented evidence that they had ever used the storage room or paid rent. Id.

Roper testified that in December 2003, after his business partner died, he began renting storage units 1-5 and 14-18 for $900.00 per month to store used medical equipment that he repairs and sells. Roper testified that in June 2004 he allowed defendant to stay in one of the units and gave defendant keys to several of the units, although defendant did not pay rent. Rather, Roper

5   - OPINION AND ORDER

allowed defendant to stay in exchange for work defendant performed for him. Roper also testified that he asked defendant to leave in mid-to-late July, and that he took the keys from defendant.

Defendant testified that he had key to units 13, 14, 17, and 18 but that he lived in unit #14. Further, defendant did not testify that he had items in unit #17, and it is unclear whether defendant stored personal belongings in unit #17 other than a portable phone handset (with the base plugged in at unit #14).

On the other hand, defendant possessed a key to unit #17, was able to exclude others, and apparently used the unit. I do not find Roper's testimony that he asked defendant to leave particularly credible in light of the fact that this information was not provided to law enforcement officers on August 4, 2004.

Although the facts are not as strong as those in Davis, I find them distinguishable from Sarkisian and sufficient - though barely - to establish an expectation of privacy in the storage unit.

## 2. Warrantless Entry and Search

Defendant argues that Thompson conducted a warrantless entry and search of storage unit #17, because he ducked under the door after defendant opened it and took several steps inside the unit. Defendant argues that he did not consent to entry of the unit, and that no exigent circumstances justify Thompson's entry into the unit or the protective sweep afterward during which officers observed evidence of methamphetamine manufacturing.

6   - OPINION AND ORDER

However, defendant's testimony largely mirrors Thompson's version of events. Defendant testified that on August 4, he let Cozo out of unit #17 and began shutting the door when Thompson knocked on the door. Defendant testified that he rolled up the door about four feet, and that Thompson immediately ducked down under door and took a few steps into unit. However, contrary to his memorandum, defendant testified that Thompson did not force the door open. Instead, defendant testified that he had fairly good relationship with Thompson, and that Thompson was not a forceful type of guy.

Further, defendant admitted that he was a holding a metal pipe when he opened the door, and that Thompson twice asked him to set it down before he complied. Defendant testified that he asked Thompson if he had search warrant, and that Thompson replied that he did not need one because he saw evidence of methamphetamine. Defendant testified that he was then taken into custody.

The only discrepancy in the testimony is whether Thompson entered the storage unit before he saw evidence of methamphetamine. Thompson testified that he was on the walkway outside the storage unit when defendant opened the door and that he did not enter the storage unit at that point. Upon moving to the right, Thompson had a plain view of the methamphetamine lab.

I find Thompson's testimony more credible in light of the fact that defendant was admittedly holding a metal pipe when he opened

7    - OPINION AND ORDER

the door to unit #17. Common sense dictates that an officer would request that a person put down such an object before moving forward. Further, defendant stated that he was arrested only one or two feet inside the unit, further supporting Thompson's version of events.

Defendant also suggests that the protective sweep of unit #17 was unlawful because no facts supported the belief that other dangerous persons may have been in the storage unit. I find this of little consequence since Thompson had already seen the methamphetamine lab, and defendant points to no additional evidence that was observed during the protective sweep. Further, given that defendant was holding a metal pipe, a protective sweep was reasonable in those circumstances.

### 3. Authority to Consent to the Search

Even if Thompson's entry into unit #17 was unlawful, the government argues that Roper gave valid consent to search the storage unit. To rely on Roper's consent, the government must show that Roper had either actual or apparent authority to consent to the search. United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir. 1998).

Here, Roper had actual authority to consent to the search of the storage units. Roper rented the units, stored medical equipment in unit #17, and possessed keys to the units. Although Roper allowed defendant to live in unit #14 and possibly use #17,

Roper had joint access to and control over the storage units. See id. Finally, even if Roper lacked such authority, the officers reasonably relied on Roper's apparent authority to give consent. See United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993) ("Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent.").

Notwithstanding this authority, defendant claims that Roper's consent cannot trump his objection to the search, relying on the Ninth Circuit's decision in Lucero v. Donovan, 354 F.2d 16, 21 (9th Cir. 1965). However, in United States v. Matlock, 415 U.S. 164 (1974), the Supreme Court held that where people have joint access and control over property "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 U.S. at 171 n.7. Regardless, the Ninth Circuit has since distinguished Lucero and held that a co-tenant's consent to the search of a residence was effective even if the other co-tenant protested. See United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995). Moreover, I question whether defendant can be deemed a co-tenant of unit #17 when he did not reside in the unit, and it is questionable whether he stored personal belongings there.

In sum, I find that Roper possessed either actual or apparent authority to consent to the search of the storage unit regardless of defendant's lack of consent.

## 4. Voluntariness of the Consent

Defendant next maintains that even if Roper had authority to give consent over defendant's objection, the consent was involuntary and therefore invalid. To establish a valid consent to search, "the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." United States v. Chan-Jimenez, 125 F.3d 1324, 1327 (9th Cir. 1997). Whether consent was voluntary depends on "the totality of the circumstances" and is a question of fact. Morning, 64 F.3d at 533.

In determining voluntariness, courts have considered: 1) whether the person was in custody; 2) whether the officers had their guns drawn; 3) whether Miranda warnings were given; 4) whether the person was told that he had a right not to consent; 5) whether the person was told a search warrant could be obtained; and 6) the person's belief as to the likelihood that contraband would be discovered. United States v. Spires, 3 F.3d 1234, 1237 (9th Cir. 1993). Although these factors may aid in the determination, "the full richness of any encounter must be considered by the district court." Morning, 64 F.3d at 533.

In this case, Roper was in custody. However, Roper was in custody on charges unrelated to the storage unit, he was provided

with Miranda warnings, and he signed a consent form. The officers wore civilian clothes and did not brandish their weapons or call attention to their firearms. Moreover, Roper testified that he gave consent to search #17 voluntarily, and that he did not give consent as a result of coercion or promises. Based on these facts, I find that Roper's consent to search unit #17 was voluntary.

Defendant next argues that the consent, even if voluntary, was a product of Thompson's unlawful entry into the storage unit and is therefore tainted. United States v. Oaxaca, 233 F.3d 1154, 1158 (9th Cir. 2000). Defendant maintains that Roper gave consent only after being confronted with Thompson's observations of the methamphetamine lab upon his unlawful entry into the unit. Defendant maintains that Roper's consent is therefore tainted by Thompson's illegal entry.

Defendant's argument fails for two reasons. First, I do not find that Thompson illegally entered the storage unit; therefore, no illegal search exists to taint Roper's consent. Second, even if Thompson's conduct constituted an unlawful entry, Roper's consent was sufficiently attenuated from the illegal conduct.

"The principle that an illegal entry taints a subsequent consent search is limited . . . to cases where the evidence shows that the illegality is so connected to the subsequent consent so as to render the consent ineffective." United States v. Furrow, 229 F.3d 805, 814 (9th Cir. 2000), overruled on other grounds, United

States v. Johnson, 256 F.3d 895 (9th Cir. 2001). If the unconstitutional search is sufficiently attenuated from the subsequent consent, then the evidence need not be suppressed.

Here, Roper did not witness the entry or protective sweep and thus would not have been intimidated by the officers' actions in doing so. See Oaxaca, 233 F.3d at 1158 (sister's consent tainted when given "mere moments after running to the garage, where she saw several armed DEA agents and her brother on his knees, already under arrest" and she was "freaking out" because she thought it was a "raid"). Further, Roper's consent was given several hours after Thompson's contact with defendant. Finally, Roper testified that he gave his consent freely and was not coerced into doing so.

Therefore, I find that Roper's consent was sufficiently attenuated from any unlawful entry, and that Roper's consent to search unit #17 was valid.

## CONCLUSION

For all of these reasons, defendant's Motion Suppress Evidence (doc. 17) is DENIED.

IT IS SO ORDERED.

Dated this __30__ day of September, 2005.

                          /s/ Ann Aiken
                           Ann Aiken
                     United States District Judge